547 A.2d 757

**COMMONWEALTH of Pennsylvania**

**v.**

**Valentine DORMAN, Appellant.**

Superior Court of Pennsylvania.

Argued June 22, 1988.

Filed Sept. 8, 1988.

Michael M. Apfelbaum and Robert B. Sacavage, Sunbury, for appellee.

Michael D. Suders, Assistant Public Defender, for appellant.

Before MONTEMURO, POPOVICH and MELINSON, JJ.

MONTEMURO, Judge:

Appellant, Valentine Dorman, appeals from the judgment of sentence entered by the Court of Common Pleas of Northumberland County following his convictions of rape, statutory rape, corruption of minors and indecent assault. We affirm.

The facts giving rise to this appeal are as follows. Appellant, who at the time of the incident was 38 years of age, offered to give his thirteen year old niece, Tina W., a ride to the raceway near her home. However, instead of taking Tina to the promised destination, appellant, after a brief detour to procure some marijuana, drove Tina down a dirt road to a secluded, wooded area. After proceeding down the road to a dead end, appellant parked the vehicle. Tina testified that appellant came over to her side of the car and began touching her. When he started to "move down," she said "don't." Nevertheless, appellant continued to fondle her and then removed her clothing, as well as his own. Appellant pushed Tina back onto the seat of the car and proceeded to have sexual intercourse with her. Other than the victim's statement "don't," nothing was said during the entire episode. However, on the way back to Tina's house, appellant instructed her not to mention the incident to anyone or he would tell her father that she smoked marijuana. Tina obeyed and did not tell anyone until several months later, when, believing she was pregnant, she told the school nurse.

Appellant was tried by a jury and convicted of rape, statutory rape, corruption of minors, and indecent assault. Following the denial of his post-trial motions, he was sentenced to a term of seven to fifteen years imprisonment on charges of rape and statutory rape, one to five years for corruption of minors, and six to twelve months for indecent

assault, the sentences to run concurrently. Appellant's motion to modify his sentence was denied. This timely appeal followed.

Appellant's first allegation of error is that the evidence is insufficient to sustain the verdict on the charge of rape. We begin our analysis by noting our standard of review when examining a claim that the evidence is insufficient to support a verdict:

> The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt.

*Commonwealth v. Aulisio,* 514 Pa. 84, 91, 522 A.2d 1075, 1079 (1987).

> The offense of Rape is defined as follows:

> A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

> (1) by forcible compulsion;

> (2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

> (3) who is unconscious; or

> (4) who is so mentally deranged or deficient that such person is incapable of consent.

18 Pa.C.S.A. § 3121.

Appellant contends that the Commonwealth failed to establish the element of forcible compulsion or threat thereof, which is required in order to sustain his conviction under 18 Pa.C.S.A. § 3121(1) and (2). More specifically, he claims that the only evidence of force in the instant case is the victim's statement "don't" when he first started to remove her clothing. He argues that in the absence of evidence that he physically compelled the victim or threatened her with violence, this testimony is not enough to prove the

forcible compulsion element of rape beyond a reasonable doubt.

This court has stated that the evidence necessary to support the element of forcible compulsion need only be such as to establish lack of consent and to induce the woman to submit without additional resistance; it is not necessary that the victim be beaten, cry, become hysterical, or be threatened with a weapon for the crime of rape to occur. *Commonwealth v. Williams,* 294 Pa.Super. 93, 439 A.2d 765 (1982). The requisite degree of force is relative, and depends on the facts and circumstances of each case. *Id.* However, the courts of this Commonwealth have not always agreed on the amount of force necessary to support a finding that the victim was forcibly compelled to submit to intercourse. This is particularly so where the forcible compulsion involves psychological, moral or intellectual force rather than physical force. The case law dealing with the element of forcible compulsion or threat thereof has been in a constant state of flux. In order to gain a proper perspective on the present state of the law, we must canvass several significant cases which provide a framework from which we can determine whether forcible compulsion or threat of forcible compulsion existed in this case.

In *Commonwealth v. Mlinarich,* 345 Pa.Super. 269, 498 A.2d 395 (1985), *aff'd,* 542 A.2d 1335 (1988), the appellant was convicted of raping a fourteen year old daughter of one of his neighbors. Appellant and his wife had taken custody of the child following her release from a juvenile detention home, where she had been committed by her family in order to "teach her a lesson" after her admission to the theft of her brother's ring. On several occasions appellant fondled the victim, requested her to undress, and engaged in sexual intercourse with her. When the victim objected to appellant's conduct, appellant threatened to send her back to the juvenile home if she failed to comply with his requests. An *en banc* panel of this court reversed the trial court and held that rape, as defined by the legislature, "requires actual physical compulsion or violence, or a threat of physical

compulsion or violence, sufficient to prevent resistance by a person of reasonable resolution." Id., 345 Pa.Superior Ct. at 286, 498 A.2d at 403. Applying that definition to the facts of the case, this Court found that a threat to withdraw custodial care and return a juvenile to a detention home was not "forcible compulsion" sufficient to constitute the crime of forcible rape.

In 1986, our supreme court decided the landmark case of *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217 (1986), which rejected our conclusion in *Mlinarich* that the term forcible compulsion is tantamount to physical compulsion or violence. *Id.*, 510 Pa. at 553 n. 12, 510 A.2d at 1225 n. 12. *See also Commonwealth v. Stambaugh*, 355 Pa.Super. 73, 512 A.2d 1216 (1986). In *Rhodes*, the defendant lived across the street from the 8 year old victim. The victim had known the defendant for approximately three (3) years. The defendant asked the victim if she wanted to go somewhere and then led her to an empty room on the second floor of an abandoned building near a playground. When the defendant began to touch her the victim told him to "stop." Nevertheless, the defendant proceeded to have both vaginal and anal intercourse with the child. The child was taken to the hospital by her mother where tests revealed the presence of semen in her vagina and rectum. In addition, she was treated for a tear in the tissue between her rectum and vagina. In an authoritative opinion authored by Justice Larsen, a majority of the supreme court held that the evidence was sufficient to support a finding of forcible compulsion or threat thereof.[1] After a lengthy analysis of the legislative history behind 18 Pa. C.S.A. § 3121 (rape), 18 Pa.C.S.A. § 3122 (statutory rape) and 18 Pa.C.S.A. § 3123 (involuntary deviate sexual intercourse), and a discussion of the common law offense of rape, the court held that the phrase "forcible compulsion" "connotes more than the exercise of sheer physical force or violence."

---

1. Four justices, representing a majority of the court, supported both the test espoused in *Rhodes* and the result reached in the case. Justices Flaherty, Hutchinson and Papadakos joined in the Opinion authored by Justice Larsen.

As used by the legislature, the court determined that the term encompassed "the act of using superior force—physical, moral, psychological, or intellectual—to compel a person to do a thing against that person's volition and/or will." *Id.* 510 Pa. at 553, 510 A.2d at 1225. In determining whether the evidence is sufficient within the above definition to prove beyond a reasonable doubt that the accused engaged in sexual intercourse by forcible compulsion or by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, the court directed that we follow a totality of the circumstances approach, and set forth a list of factors to aid us in this determination. The factors to be weighed include, but are not limited to:

> [t]he respective ages of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

*Id.*, 510 Pa. at 556, 510 A.2d at 1227. The court went on to conclude that the facts of the case were sufficient to establish the element of forcible compulsion and threat of forcible compulsion. In so concluding, the court reasoned:

> There is an element of forcible compulsion, or the threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, inherent in the situation in which an adult who is with a child who is younger, smaller, less psychologically and emotionally mature, and less sophisticated than the adult, instructs the child to submit to the performance of sexual acts. This is especially so where the child knows and trusts the adult. In such cases, forcible compulsion or the threat of forcible compulsion derives from the respective capacities of the child and the adult sufficient to induce the child to submit to the wishes of the adult ("prevent resistance"), without the use of physical force or violence or the explicit threat of physical force or violence. As Judge Cavanaugh noted in his dissenting opinion in this case, "the illicit commands

of this twenty year old [man] in an isolated and abandoned room were ... an imperative which gave the [eight year old] child victim no alternative but submission to appellant's corrupt scheme."

*Id.*, 510 Pa. at 557–558, 510 A.2d at 1227.

After *Rhodes,* there seemed to be no question that psychological, moral or intellectual force could support a finding of forcible compulsion. However some uncertainty was cast upon this proposition when the Pennsylvania Supreme Court granted the Commonwealth's petition for allowance of appeal in the *Mlinarich* case and considered the question of whether the accused's threat to send the victim back to the juvenile home constituted "forcible compulsion" or "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution" within the meaning of 18 Pa.C.S.A. § 3121(1) and (2). *See Commonwealth v. Mlinarich,* 542 A.2d 1335 (1988). Three justices concluded that such a threat was not sufficient to support a conviction for rape and joined in an opinion in support of affirmance of this Court's *en banc* decision. Chief Justice Nix, author of the Opinion in Support of Affirmance, concluded that "the term 'forcible compulsion' includes both physical force as well as psychological duress [but] reject[ed] the contention that 'forcible compulsion' was intended by the General Assembly, in this context, to be extended to embrace appeals to the intellect or the morals of the victim." *Id.* at 1338. At only one point throughout the entire opinion did Chief Justice Nix cite to *Rhodes,* and that was merely to support the proposition that "psychological coercion ... may overpower the will to resist as effectively as physical force." *Id.* at 1342. Justice Larsen, in an Opinion in Support of Reversal, relied almost exclusively on *Rhodes* to support his position, remarking that:

*Rhodes* is the law of this Commonwealth, and is unquestionably dispositive in this case; *Rhodes* compels the conclusion that Mlinarich engaged in sexual intercourse with the child victim without her consent and by forcible compulsion or its threat. The Opinion in Support of

Affirmance does not attempt to distinguish *Rhodes,* nor does it attempt to explain in any way why it is not controlling. Instead, the three members of this Court in support of affirmance simply ignore *Rhodes* and pretend that it does not exist. *Rhodes* does exist, however, and remains the law of the Commonwealth.

542 A.2d 1335 in Support of Reversal at 17, filed May 26, 1988. Because the three justices who supported affirmance in *Mlinarich* adopted an analysis of the statutory scheme which appears to be somewhat inconsistent with the analysis in *Rhodes,* and because they declined to apply the test outlined in *Rhodes* to the facts in *Mlinarich,* we are inclined to believe that they may no longer support much of the reasoning and analysis employed two years earlier in *Rhodes.* However, our obligation as an appellate tribunal is to adhere to principles of *stare decisis* and apply what we perceive to be the law to the facts of a given case. *Mlinarich* was decided by an equally divided supreme court.[2] Consequently, the effect of that decision was to affirm the result reached by the *en banc* Superior Court below. However, the decision of the supreme court did not have the effect of affirming our reasoning in *Mlinarich.* In addition, because the supreme court was equally divided in *Mlinarich,* the reasoning used by the supreme court has no precedential value and is merely persuasive in nature. *See Commonwealth v. Covil,* 474 Pa. 375, 378 A.2d 841 (1977) (analysis adopted by three of the six Justices of supreme court had no precedential value and is only considered for it persuasive value in subsequent cases). Consequently, we are constrained to agree with Justice Larsen that *Rhodes* is indeed the law of this Commonwealth and will remain so until overruled. Moreover, we believe that *Rhodes* is dispositive of the present case.

Returning to the facts of the case at bar and applying the test enunciated in *Rhodes,* we find that the evidence is sufficient to prove beyond a reasonable doubt that appellant

2. Former Justice Hutchinson did not participate in the consideration of *Mlinarich.*

had sexual intercourse with his thirteen (13) year old victim by forcible compulsion and by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution in the victim's position. The victim recounted the incident as follows:

Q. What happened at the dirt road, Tina?

A. Well, he got out and came over to my side and he opened the door.

Q. Tina, I know it is tough but you will have to explain to the jury what happened. Like I said, just stop us if you want to take a break at all. Could you explain to the jury what happened?

A. Started touching me.

Q. Would you tell the jury where he started to touch you?

A. In the front.

Q. Then what happened?

A. Then he started to move down.

Q. Did you say anything while he did this?

A. I said "don't."

Q. What happened after you said don't?

A. He didn't say anything, he just kept on doing it.

Q. Then what happened, Tina?

A. He removed my clothes.

Q. Did he have his clothes on at that point?

A. No, he started taking his off.

Q. Could you tell the jury what happened then?

A. Well, he pushed me back, then he got on top of me and he started, he stuck his penis in my vagina, then after he was done he got up and he got dressed, then I got up and I got dressed, then he came around to the other side of the car and got in and I shut my car door, then we took off.

Q. Did he say anything to you?

A. No, not then.

Q. Is this out in the woods, Tina?

A. Yeah.

Q. What happened after that?

A. Then he took me home.

Q. Did he say anything on the way home?

A. No, not then. But when he came to the speedway he said I shouldn't tell anybody.

Q. Why is that?

A. Because he said that he would tell my dad that I smoked Marijuana.

N.T. March 17, 1987 at 23–25.

Applying the factors outlined in *Rhodes* to the foregoing evidence convinces us that the victim in this case submitted to sexual intercourse under forcible compulsion or threat thereof that would prevent resistance from a person of reasonable resolution. The thirteen (13) year old victim was driven down a deadend dirt road to a remote wooded area. Despite the victim's protest, appellant, who was twenty-five (25) years the victim's senior, disrobed her, pushed her down on the seat of the car and had intercourse with her. Although there was no evidence that the victim struggled or otherwise resisted, other than saying "don't," this fact does not negate a finding of forcible compulsion. In light of the remote locality where the incident occurred, the absence of more strenuous resistance is easily understandable. The victim cannot be expected to cry out or struggle vigorously when such action may have the effect of escalating the danger already present in the volatile circumstances of an imminent rape. More importantly, appellant, who was the victim's uncle, occupied a position of authority and trust such that the victim would feel coerced to submit to his demands out of a sense of duty or obedience. While the force used to overcome the will of the victim in this case was to a large extent subtle and psychological, it nonetheless satisfies the element of forcible compulsion necessary to sustain appellant's conviction for rape. *See Commonwealth v. Poindexter*, 372 Pa.Super. 566, 573, 539 A.2d 1341, 1344 (1988). Viewing these facts and the inferences to be drawn from them in the light most favorable to the

Commonwealth, we believe that the jury could reasonably have concluded that the force or threat of force used was sufficient to establish that the will of the victim had been overcome under the totality of circumstances involved in this case. *Id.; Commonwealth v. Williams, supra* 294 Pa.Super. at 97, 439 A.2d at 768 (1982). Accordingly, we conclude that the trial court correctly rejected appellant's contention that the evidence was insufficient to support the jury's verdict.

■ Appellant next claims that the trial court erred by instructing the jury that they could draw an adverse inference against appellant for failing to call a potential alibi witness when the witness was residing in the state of New York and failed to obey a subpoena. Appellant's defense at trial was an alibi defense. At trial appellant took the stand and testified that on August 10, 1985, at the time that the alleged rape took place, he was delivering a car to his cousin, Darvin Carter, in New York. Appellant also testified that his cousin was not present to testify despite the fact that he had subpoenaed him in New York. Following closing arguments wherein both the prosecutor and defense attorney referred to the other side's failure to procure certain witnesses, the trial court, *sua sponte*, gave the following instruction upon charging the jury:

> There has been an issue raised as to the missing witness or witnesses. That question raises the question of what weight, if any, you would give to the fact that *both the Commonwealth and the defendant* failed to call possible witnesses. You may infer that a possible witness would have given testimony unfavorable to the party who failed to call them. If it was natural and reasonable to expect that party to call them, and there is no satisfactory explanation for why the party failed to call them. You should consider this along with all relevant facts and circumstances in determining this case. The inference that a potential witness's testimony would have been unfavorable to the party who failed to call them is an inference that you may draw. It is not an inference that

you are required to draw. Note that an inference is merely that testimony might have been unfavorable, not that it would have been unfavorable. The inference is not a substitute for facts that you do believe.

N.T. March 17, 1987 at 168–169 (emphasis added). After the court concluded its charge to the jury, defense counsel objected to the missing witness instruction and moved for a mistrial on grounds that an instruction on missing witnesses is only proper when the witness is within the exclusive control of a party.[3] *Id.* at 179. We find that the trial court's instruction on missing witnesses was appropriate under the circumstances of this case.

The instruction on missing witnesses is essentially a comment on the evidence; the inference itself is the natural inference that a party's failure to call a witness in certain circumstances suggests that he was afraid to do so, which in turn suggests that the testimony would have been unfavorable. *See Downey v. Weston,* 451 Pa. 259, 266, 301 A.2d 635, 640 (1973). While there has been a substantial number of formulations of the rule purporting to encompass all of the situations where an instruction on missing witnesses is proper, the most comprehensive attempt to state the rule and exceptions occurred in *Commonwealth v. Harley,* 275 Pa.Super. 407, 418 A.2d 1354 (1980):

The missing witness rule provides that a negative inference may be drawn from the failure of a party to call a particular witness who was in his control. However, each of the following circumstances represents an exception to that rule:

1. The witness is so hostile or prejudiced against the party expected to call him that there is a small possibility of obtaining unbiased truth;

2. The testimony of such a witness is comparatively unimportant, cumulative, or inferior to that already presented;

---

3. Pa.R.Crim.P. 1119(b) requires specific objections to the court's charge before the jury retires to deliberate in order to preserve the challenge for appellate review.

3. The uncalled witness is equally available to both parties;

4. There is a satisfactory explanation as to why the party failed to call such a witness;

5. The witness is not available or not within the control of the party against whom the negative inference is desired; and,

6. The testimony of the uncalled witness is not within the scope of the natural interest of the party failing to produce him.

*Id.*, 275 Pa.Superior Ct. at 413, 418 A.2d 1357. The foregoing rule, however, was by no means intended to constitute an exhaustive list of the situations where a missing witness instruction is proper. The propriety of such an instruction depends on the facts of each particular case. As we have said "the reasons why certain evidence which might naturally be looked for, may not be produced, are so many and so various, that the inference to be drawn from failure to produce requires careful handling.... But it is a legitimate instrument in the investigation of truth and a liberal discretion in its use must be allowed the trial judge." *Commonwealth v. Trignani*, 185 Pa.Super. 332, 341, 138 A.2d 215, 219–220 (1958). Indeed, Pennsylvania cases acknowledge that a missing witness instruction may be proper where a party fails to produce a witness, who, because of his or her relationship with that party, would normally be expected to testify favorably in the parties' behalf. *See e.g. Hall v. Vanderpool*, 156 Pa. 152, 26 A. 1069 (1893); *Commonwealth v. Black*, 186 Pa.Super. 160, 142 A.2d 495 (1958). In *Commonwealth v. Wright*, 444 Pa. 536, 282 A.2d 323 (1971), our supreme court was faced with a situation similar to the present one. In *Wright*, the defendant and two others, one Marion Wilson and Robert McSwain, were charged with murder. At trial the defendant took the stand and testified that on the night in question he, McSwain and Wilson were in the company of four other teenagers at the time of the murder. None of these witnesses testified at

trial. Our supreme court framed the question as follows: "If a defendant raises an alibi and testifies as to the existence of named alibi witnesses who know him personally, and if these witnesses are not called, is it fair for the jury to infer that their testimony would be adverse to the defendant?" *Id.*, 444 Pa. at 541, 282 A.2d at 325. In finding that such an inference could properly be drawn, the court remarked:

> Since the inference is permissible, it would have been error for the court to instruct the jury the other way, i.e., that the failure to call the named witnesses could *not* be considered in evaluating the credibility of appellant's alibi. Consequently, even though the inference is only permissible, courts are permitted to comment on the possibility of drawing such an inference just as courts are permitted to comment on every other factor which a jury is permitted to consider.

> However, we must emphasize, at this point, that while it is permissible for a jury to draw adverse inferences as to the credibility of a defendant's alibi from his failure to call persons he identifies as eye-witnesses, such inferences are not mandatory. Furthermore, such inferences do not affect the presumption of innocence. The Commonwealth must still prove that the defendant committed the crimes alleged beyond a reasonable doubt.

> Admittedly, if the jury chooses to draw an adverse inference from a defendant's failure to call named alibi witnesses, his case may be affected because his alibi is not believed. But the credibility of defendant's testimony is always something which he must consider before he takes the stand.

> Nevertheless, since any inferences to be drawn are permissible, not mandatory, if a court chooses to charge on this issue, it must be careful not to overemphasize it so as to mislead the jury into believing the inference to be mandatory rather than only permissible.

*Id.,* 444 Pa. at 541–542, 282 A.2d at 325.[4]

In the case at bar appellant's cousin, who he was allegedly delivering a car to on the night in question, was a resident of New York. At trial, appellant testified that he had subpoenaed his cousin in New York but that he refused to appear. Appellant argues that because his alibi witness was equally available to the Commonwealth by way of subpoena, the trial court erred in giving the missing witness instruction. However, this argument ignores several important considerations. First, "availability" is not determined merely from a witness's physical presence or amenability to subpoena but also depends on the witness's relationship to the party and the nature of the expected testimony. Both the Supreme Court of Pennsylvania and this Court have applied the missing witness rule even though the witness was technically available to the party seeking the advantage of the inference. *See Commonwealth v. Leonard,* 499 Pa. 357, 453 A.2d 587 (1982); *Commonwealth v. Johnson,* 457 Pa. 554, 327 A.2d 632 (1974); *Wright, supra; See also Commonwealth v. Bright,* 361 Pa.Super. 261, 522 A.2d 573 (1987) (reaffirming the reasoning used in *Wright* when the defendant raises an alibi defense and testifies as to witnesses which he claims can support it); *Commonwealth v. Rompilla,* 250 Pa.Super. 139, 378 A.2d 865 (1977). For the negative inference to be inappropriate, as appellant argues, the missing witness must not just be "available" to the Commonwealth, but equally so. Secondly, the Commonwealth should not be required to subpoena an alibi witness, who, because of his relationship with the defendant, would naturally be expected to testify favorably toward the defendant. Obviously, it would not be in the best interest of the Commonwealth to procure such a potentially hostile witness. On the other hand, fear of criminal punishment and the disgrace of conviction are strong motivational factors for a criminal defendant to make certain that a witness who can exonerate him appears at trial. Our

4. Although the court in *Wright* found the inference proper under the facts of the case, it went on to reverse because it found that the missing witness charge was overemphasized by the court.

supreme court implicitly recognized these practical consider-
ations in *Commonwealth v. Leonard, supra.* In *Leonard,*
the defendant, who had been convicted of murder, alleged
that his trial counsel was ineffective in failing to object to
the prosecutor's argument to the jury that they could draw
an adverse inference from the defendant's failure to present
several alibi witnesses who he testified could support his
alibi. Citing both *Wright* and *Johnson,* the Pennsylvania
Supreme Court rejected the defendant's claim of ineffective-
ness, reasserting the propriety of such an inference where
the defendant fails to produce a named alibi witness at trial:

> This Court has held that where an accused raises an alibi
> defense and names a person who it is claimed can support
> the defense, but fails to call him as a witness, it is
> permissible for the jury to infer that the testimony of the
> absent witness would not have been favorable to the
> accused. Because it was not improper for the prosecut-
> ing attorney to urge the jury to draw the inference that
> the testimony of the [defendant's] alleged alibi witnesses
> would not have corroborated his alibi, counsel was not
> ineffective for not interjecting an objection to the prose-
> cutor's remark.

*Id.* 499 Pa. at 364–365, 453 A.2d at 590 (citations omitted).
While appellant relies on the equal availability exception to
the missing witness rule set forth in our decision in *Com-
monwealth v. Harley, supra,* we note that *Harley* involved
the Commonwealth's failure to present fact witnesses rath-
er than the defendant's failure to call named alibi witnesses.
Moreover, *Leonard* was decided approximately two years
after *Harley.* Thus our supreme court was well aware of
the equal availability exception to the missing witness rule,
but chose not to apply that exception in *Leonard,* even
though the defendant's alibi witnesses would have been
made available to the Commonwealth through the inclusion
of their names and addresses in the notice of alibi defense.
*See* Pa.R.Crim.P. 305(C)(1)(a). Consequently, we believe
that our supreme court implicitly rejected the applicability
of the equal availability exception to cases where the de-

fendant asserts an alibi defense and testifies to named alibi witnesses who can support that defense.

Arguably, the fact that the witness is outside the court's subpoena power should militate against drawing an adverse inference from his absence because this constitutes either a reasonable excuse for failing to present the witness or renders the witness unavailable to the party against whom the inference is sought. The logic behind disallowing the inference when a witness is truly beyond a party's control is that the underlying basis for permitting the inference crumbles. In other words, when the witness is not within a party's control, there is no basis for inferring that he was afraid to call the witness and consequently no basis for inferring that the witness's testimony would be unfavorable. However, the mere fact that appellant subpoenaed his out-of-state cousin does not mean that it was beyond his control to compel his presence at trial. Aside from the fact that one would expect a relative who possessed exculpatory evidence to come forward of his own volition, appellant had at his disposal a means by which he could have compelled his cousin's presence. The Uniform Act to Secure Attendance of Witness [5], which has been enacted in both Pennsylvania and New York, "provides a speedy and effective procedure, through the use of a certificate issued under seal of court, to summon witnesses living in another state." *U.S. ex rel. Drew v. Meyers*, 327 F.2d 174, 182 (3d.Cir.1964). Because appellant had sufficient means to compel the presence of his cousin to appear if he chose not to appear, and there is no evidence that appellant sought to avail himself of this procedure, we find that the witness was peculiarly within appellant's knowledge and reach and that he has not presented a reasonable excuse for failing to present this witness. *Accord State v. Ivory*, 609 S.W.2d 217 (Mo.App. 1980) (wherein the court found a missing witness instruction proper even though defendant's alibi witnesses, who were family members, were located out of state); *Commonwealth v. Griffin*, 243 Pa.Super. 115, 364 A.2d 477

5. Act of June 23, 1941, P.L. 147 § 1 et seq., 19 P.S. § 622.1 et seq.

(1976) (unavailability under former testimony exception to hearsay rule established by Commonwealth's good faith attempt to procure witness under Uniform Act to Secure Attendance of Witness. 19 Pa.S.A. § 622.2). Consequently, we hold that where a defendant takes the stand and testifies that at the time of the alleged crime he was in the presence of his cousin, who is situated out of state, and his cousin fails to appear at trial, the trial court may properly give a neutral missing witness instruction to the jury, explaining the nature of the inference to the jury but leaving the jury free to determine whether to draw the inference and against whom to draw it. *See Commonwealth v. Bruce*, 433 Pa. 68, 249 A.2d 346 (1969); Packel, Pennsylvania Evidence, § 419.3 (1987).[6]

We believe that the trial court's instruction in this case did not overemphasize the negative inference to be drawn from a party's failure to present a witness, but merely informed the jury that it could draw the inference against *either* the defendant or the Commonwealth if it chose to do so. In light of the fact that both the prosecutor and defense counsel alluded to missing witnesses in their closing arguments, a diluted missing witness instruction was proper in order to guide the jury in its deliberations. *See* N.T. March 17, 1987, at 179.

Appellant's final contention is that the trial court erred in failing to appoint new counsel for him after he dismissed his counsel during the sentencing hearing. However, appellant failed to specifically raise this issue in his

6.  While our holding may, at first glance, appear to conflict with some of our reasoning in *Commonwealth v. Boyd,* 356 Pa.Super. 302, 514 A.2d 623 (1986), that case is distinguishable from the present one in at least two respects. In *Boyd,* it was not the defendant who injected the name of an alibi witness who failed to testify, but an alibi witness testifying on behalf of defendant who stated that he saw appellant in the company of a named woman on the night of the alleged incident. Moreover, the instruction in that case was not neutral. Unlike the present case, the jury in *Boyd* was not permitted to determine if, and against whom the inference should operate. Instead, because the Commonwealth had presented all witnesses who would be expected to testify on its behalf, the court specifically related the instruction to the defendant's failure to produce the second alibi witness.

petition to modify sentence. The purpose of a petition to modify sentence is to provide the sentencing court with the first opportunity to modify its sentence and to correct errors which may have occurred during sentencing. *Commonwealth v. Cottman*, 327 Pa.Super. 453, 476 A.2d 40 (1984). All claims regarding the propriety of sentence or irregularities in the proceedings must be raised in a petition to modify sentence or they are waived for purposes of appeal. *See* Pa.R.Crim.P. 1410; *Commonwealth v. Duden*, 326 Pa.Super. 73, 473 A.2d 614 (1984); *Commonwealth v. Middleton*, 320 Pa.Super. 533, 467 A.2d 841 (1983). Because appellant, who was represented by new counsel at the time he filed his petition for modification of sentence, failed to raise this contention in his petition, we find the issue waived. Accordingly, the trial court's judgment of sentence is affirmed.

Judgment of sentence affirmed.